# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

        Plaintiff,

    v.

STEPHANIE LASKIN, KRISTOFER
LANDELL, GUNAY YAKUP, MADELINE
ALONGE, and ROGER OSTERHOUDT

        Defendants.

1:21-CR-00067, 154, 72, 136, 122

**UNITED STATES' CONSOLIDATED SENTENCING MEMO**

i

## TABLE OF CONTENTS

FACTUAL & REGULATORY BACKGROUND ................................................................. 2

1. Regulatory Framework ............................................................................................. 2

   a. Federal Clean Air Act Regulation .................................................................... 2

   b. New York State Asbestos Regulations ............................................................ 4

   c. Federal Occupational Safety and Health Act regulations ............................. 5

2. Factual and Procedural Background ....................................................................... 5

   a. Relevant Entities, Initial TechCity Bidding Process, Contractor Selection ........... 5

   b. HRVE's Bid, Variance Petition, &and Expanded Oversight Obligations ............... 8

   c. Contract #1 and Initial Work by A2ES and Jeffrey Laskin ............................. 9

   d. Initial Termination of the Laskins and Negotiation of Contract #2 ............... 14

   e. Work Under Contract #2 and the August 2016 "Red-Tagging" ................... 15

   f. The Investigation ............................................................................................ 18

   g. Legal Proceedings to Date and Identification of Victims ............................. 20

3. Applicable Legal Standards at Sentencing ........................................................... 20

APPLICATION OF THE SENTENCING GUIDELINES ........................................... 23

1. Guidelines Calculations .......................................................................................... 23

2. Criminal Fine .......................................................................................................... 23

3. Restitution ................................................................................................................ 23

   a. The Primary Purpose of Restitution is to Compensate Victims Like Those in this Case –
      i.e., the Environmental Protection Agency and Individual Members of the
      Community, who were Potentially Exposed ........................................................ 23

   b. Restitution is Mandatory per 18 U.S.C. § 3663A .......................................... 24

   c. The Total Amount of Restitution Must be Calculated Regardless of Economic
      Circumstances ................................................................................................. 25

   d. United States' Recommendations for Apportionment .................................... 26

ANALYSIS OF § 3553(a) FACTORS ........................................................................... 29

1. Nature and Seriousness of the Offense .................................................................. 29

   a. The Dangers of Asbestos Generally ............................................................... 29

b.   The Defendants Were Aware of the Dangers of Asbestos and Willingly Exposed People to Such Risk for Profit. ........................................................................... 30

**2.   History and Characteristics of the Defendants and the Risk of Recidivism .............. 32**

a.   Defendants Laskin, Landell, Alonge, and Osterhoudt ................................. 32

b.   Defendant Yakup........................................................................................ 33

**3.   Promoting Respect for the Law ................................................................................ 33**

a.   Defendants Laskin and Landell................................................................... 34

b.   Defendants Alonge and Yakup ................................................................... 38

c.   Defendant Osterhoudt ................................................................................ 39

**4.   Deterrence .................................................................................................................. 39**

a.   Specific Deterrence .................................................................................... 40

b.   General Deterrence ..................................................................................... 41

**CONCLUSION .................................................................................................................... 42**

**EXHIBIT LIST**

| Ex. # | Description |
|---|---|
| 1 | Selected Investigative Activity Reports (alphabetized by last name) |
| 2 | Selected Interview Transcriptions (alphabetized by last name) |
| 3 | Collection of Selected Correspondence |
| 4 | Photographs of Site Conditions in August 2016 |
| 5 | NEIC Report |
| 6 | SCORPIOS Report |
| 7 | Clinical Estimates for Screening Procedure |
| 8 | Selected Text Messages Showing Relationship Between Defendants Laskin & Alonge |
| 9 | HRVE Variance Petition Application and Approval |
| 10 | Declaration of Jason Pensabene (along with referenced exhibits) |
| 11 | Photograph of Defendant Alonge During Abatement Work |
| 12 | A2ES Investment Proposal |
| 13 | Contract Negotiations Between Defendants Laskin and Osterhoudt |
| 14 | Notices of Violation Issued During 2015-2016 |
| 15 | Investigative Activity Report of Jason Pensabene |

# TABLE OF AUTHORITIES

Federal Cases

*Dolan v. United States*, 560 U.S. 605 (2010) .................................................................... 24

*McClain v. United States*, 676 F.2d 915 (2d Cir. 1982) ...................................................... 21

*Phan v. McCoy*, No. 94-CV-1596 (RSP/GJD), 1997 WL 570690 (N.D.N.Y. Aug. 28, 1997) .... 21

*U.S. v. Weintraub,* 273 F.3d 139 (2d Cir. 2001) .................................................................. 3

*United States v. Ahders*, 622 F.3d 115 (2d Cir. 2010) ....................................................... 21

*United States v. Atkinson*, 788 F.2d 900 (2d Cir.1986) ...................................................... 24

*United States v. Booher*, 242 F.App'x 952 (4th Cir. 2007) ................................................ 22

*United States v. Brock-Davis*, 504 F.3d 991 (9th Cir. 2007) .............................................. 25

*United States v. Desnoyers*, No. 11-CR-5194, 2009 WL 2986664 (N.D.N.Y. Sept. 14, 2009) ... 41

*United States v. House*, 551 F.3d 694 (7th Cir. 2008) ....................................................... 22

*United States v. Knapp*, No. 4:10-CR-00025 (S.D. Iowa Mar. 18, 2011) ............................ 32

*United States v. Lee*, 818 F.2d 1052 (2d Cir.1987) ............................................................ 21

*United States v. Mancuso*, No. 08-CR-611, 2010 WL 11530536 (N.D.N.Y. June 8, 2009) ........ 32

*United States v. Mattice*, 186 F.3d 219 (2d Cir. 1999) ....................................................... 24

*United States v. Montgomery*, 262 F.3d 233 (4th Cir. 2001) .............................................. 22

*United States v. Phillips*, 367 F.3d 846 (9th Cir. 2004) ..................................................... 24

*United States v. Porter*, 90 F.3d 64 (2d Cir.1996) ............................................................. 24

*United States v. Pristell*, 941 F.3d 44 (2d Cir. 2019) ........................................................ 21

*United States v. Pugliese*, 805 F.2d 1117 (2d Cir. 1986) ................................................... 22

*United States v. Reed*, 744 F. App'x *16 (2d Cir. 2018) ..................................................... 22

*United States v. Reese*, 33 F.3d 166 (2d Cir. 1994) ................................................ 22

*United States v. Romano*, 825 F.2d 725 (2d Cir. 1987) ....................................... 21, 22

*United States v. Sawyer*, 825 F.3d 287 (6th Cir.) ................................................. 24

*United States v. Sawyer, et al.*, No. 2:11-CR-82, 2013 WL 1702642 (E.D. Tenn. Jan. 19, 2013)31

*United States v. Shurelds*, 173 F.3d 430 (Table), 1999 WL 137636, at *1 (6th Cir. Mar. 2, 1999)2

*United States v. Starnes*, 583 F.3d 196 (3d Cir. 2009) ................................................ 32

*United States v. Streich*, 987 F.2d 104 (2d. Cir. 1993) ............................................... 22

*United States v. Terry*, 916 F.2d 157 (4th Cir. 1990) ................................................. 21

*United States v. Tucker*, 404 U.S. 443 (1972) ........................................................ 21

*United States v. Watkins*, 667 F.3d 254 (2d Cir. 2012) ............................................... 21

*United States v. Weintraub*, 273 F.3d 139 (2d Cir. 2001) ........................................... 2

*United States v. Yi*, 2:10-CR-00793-PA-1 (C.D. Cal. June 7, 2011) ............................... 32

*Univ. of Cincinnati v. Arkwright Mut. Ins. Co.*, 51 F.3d 1277 (6th Cir. 1995)..................... 3

*Williams v. People of State of N.Y.*, 337 U.S. 241, 69 S. Ct. 1079, 93 L. Ed. 1337 (1949).......... 22

## Federal Statutes

18 U.S.C. § 3553 ....................................................................................... 29

18 U.S.C. § 3663 ....................................................................................... 25

18 U.S.C. § 3663A ................................................................................. 24, 25

18 U.S.C. § 3664 ........................................................................... 25, 26, 27, 28

18 U.S.C. § 3664(h) ................................................................................... 25

20 U.S.C. § 3601(a)(3) .................................................................................. 2

40 C.F.R. § 61.04 ....................................................................................... 4

40.C.F.R. § 302.4 ...................................................................................... 29

42 U.S.C. § 7412 ........................................................................................ 2, 4, 29

42 U.S.C. § 7413(c)(1) ...................................................................................... 2

Federal Rules

29 C.F.R. § 1926.1101 ...................................................................................... 5

40 C.F.R. § 61.145 ....................................................................................... 3, 4

40 C.F.R. § 61.150 ....................................................................................... 3, 4

40 C.F.R. §§ 61.141 ......................................................................................... 2

40 C.F.R. §§ 61.145(c) ..................................................................................... 4

## Other Authorities

AGENCY FOR TOXIC SUBSTANCE & DISEASE REGISTRY [ATSDR], CAS#: 1332-21-4, PUBLIC

    HEALTH STATEMENT ASBESTOS (Sept. 2001) ........................................... 29

Int'l Programme on Chem. Safety [IPCS], World Health Org. [WHO], Rep. on Environmental

    Health Criteria 203: Chrysotile Asbestos (1998),

    http://www.inchem.org/documents/ehc/ehc/ehc203.htm. ......................... 30

World Health Org. Reg'l Off. for Eur., *Air Quality Guidelines for Europe*, at 133 (2d ed. 2000)29

**ACRONYM LIST**

| Acronym | Definition | Citation (if applicable) |
|---|---|---|
| A2ES | A2 Environmental Solutions | NA |
| CAA | Clean Air Act | 42 U.S.C. §§ 7401 *et seq.* |
| CID | Criminal Investigation Division | NA |
| CR56 | Code Rule 56 | 12 N.Y.C.R.R. Part 56 |
| CVRA | Crime Victim Rights Act | 18 U.S.C. §§ 3771 *et seq.* |
| EPA | Environmental Protection Agency | EPA |
| HRVE | Hudson River Valley Environmental | NA |
| IAR | Investigative Activity Report | NA |
| IPCS | Int'l Programme of Chemical Safety | NA |
| MVRA | Mandatory Victim Restitution Act | 18 U.S.C. § 3663A |
| NEIC | Nat'l Enforcement Investigations Center | NA |
| NESHAPs | Nat'l Emissions Standards for Hazardous Air Pollutants | 42 U.S.C. §§ 7412; 40 C.F.R. §§ 61.145, 61.150 (asbestos) |
| NYSDOL | New York State Dep't of Labor | NA |
| OSHA | Occupational Safety & Health Act (or Administration) | 29 U.S.C. §§ 651 *et seq.* |
| NOV | Notice of Violation | NA |
| PA | Plea Agreement | NA |
| PPE | Personal Protective Equipment | NA |
| RACM | Regulated Asbestos Containing Materials | 40 C.F.R. §§ 61.141 (definitions) |
| SACM | Suspected Asbestos Containing Materials | 40 C.F.R. §§ 61.141 (definitions) |
| SCORPIOS | Superfund Cost Recovery and Imaging Online System | NA |

The United States of America, by and through the undersigned attorneys of the Environmental Crimes Section, submits this sentencing memorandum pursuant to Rule 32 of the Federal Rules of Criminal Procedure. For the reasons set forth herein, the United States respectfully requests the imposition of the following sentences for the above-captioned defendants:

- Stephanie Laskin: 23 months incarceration, 3 years supervised release
- Kristofer Landell: 29 months incarceration, 3 years supervised release
- Gunay Yakup: 15 months incarceration, 3 years supervised release
- Madeline Alonge: 15 months incarceration, 3 years supervised release
- Roger Osterhoudt: 18 months probation (including 6 months home-confinement)

In addition, the United States proposes the following with respect to all defendants:

o Restitution to be paid to (1) those community members who were potentially exposed to hazardous air pollutants, to be imposed jointly and severally against all defendants; and, (2) the Environmental Protection Agency ("EPA") to compensate it for the direct response costs associated with remediating asbestos contamination to be imposed jointly and severally against defendants Laskin, Landell, and Osterhoudt.
o A special condition of supervised release and/or probation that all defendants relinquish all licenses, permits, and certificates related to asbestos surveying, monitoring, abatement, and disposal, and that they agree that neither they, nor any entity or person with whom they are affiliated, participate in the construction and/or aforementioned asbestos industries during their terms of supervision.[1]
o Appropriate special assessments.
o No criminal fines, provided that the Court imposes appropriate restitution as outlined herein.

---

[1] This condition is particularly relevant to defendant Landell insofar that it was recently discovered that he has been concealing his continued involvement in the air- and project-monitoring industry by using other d/b/a's and the names of other individuals. *See* Declaration of Jason Pensabene (Exhibit 10 hereto).

1

## FACTUAL & REGULATORY BACKGROUND

**1. Regulatory Framework**

Asbestos removal operations, as well as renovation and demolition operations that would disturb "regulated asbestos containing materials" ("RACM"), are heavily regulated by federal and New York state laws and regulations.

**a. Federal Clean Air Act Regulation**

Asbestos is a "listed" hazardous substance and hazardous air pollutant. *See* 42 U.S.C. § 7412(b)(1) (2012); 40 C.F.R. § 302.4 (2019). Medical science has established no minimum level at which human exposure to asbestos fibers is considered safe. 20 U.S.C. § 3601(a)(3) (2012). The Clean Air Act ("CAA"), 42 U.S.C. § 7413(c)(1), provides criminal penalties for any person who knowingly violates any requirement or prohibition of 42 U.S.C. § 7412. That CAA provision provides for "work practice standards" governing asbestos renovation and demolition projects. *Id.* §§ 7412(b), (h). Regulations governing work practice standards, known as National Emission Standards for Hazardous Air Pollutants ("NESHAPs"), which are promulgated at Subpart M, apply to asbestos renovation and demolition projects and are found at 40 C.F.R. §§ 61.141 (definitions), 61.145, 61.150 and 61.154. *See also United States v. Shurelds*, 173 F.3d 430 (Table), 1999 WL 137636, at *1 (6th Cir. Mar. 2, 1999) (per curiam); *United States v. Weintraub*, 273 F.3d 139, 144–48 (2d Cir. 2001).

For renovation or demolition activities involving asbestos, 40 C.F.R. § 61.145 contains three basic subsections. First, subsection (a), entitled "Applicability," requires that a thorough inspection, or "survey," occur prior to renovation or demolition activities to determine whether

2

regulated asbestos containing material ("RACM" or "asbestos"[2]) in a jurisdictional amount[3] is present, and if so, where and in what specific amounts. 40 C.F.R. § 61.145(a).

Second, 40 C.F.R. § 61.145(c) establishes "Procedures for asbestos emission control," (a.k.a., "work practice standards") that must be followed during renovation and demolition activities. Among other things, subsection (c) requires that all RACM be removed from a facility being demolished or renovated, before any activity begins that would break up, dislodge, or similarly disturb the material or preclude access to the material.[4] *See, e.g.*, *Univ. of Cincinnati v. Arkwright Mut. Ins. Co.*, 51 F.3d 1277, 1278 (6th Cir. 1995) ("[R]emoval of [asbestos] prior to demolition [is] required . . . by federal regulation, 40 C.F.R. § 61.145 and 61.150 . . . ."); *see also U.S. v. Weintraub*, 273 F.3d 139, 149, 152 (2d Cir. 2001) (finding that the jury instruction was proper where "the jury had to find that [the defendant] 'knew of wrecking and dismantling that broke up [the] regulated asbestos-containing materials . . . occurred before removing [the] asbestos . . . from the facility"). When being stripped from facility components, RACM must be adequately wetted. 40 C.F.R. §§ 61.145(c)(2)–(3), (6). RACM not located on the ground level—

---

[2] RACM is defined by the regulations to include all friable asbestos, as well as any Category I nonfriable asbestos (including floor covering and asphalt roofing materials) that has been, or will be, subjected to sanding, grinding, cutting, or abrading, and any Category II nonfriable asbestos (i.e., all other nonfriable asbestos containing material) that has a high probability of becoming friable as a result of the forces acting on the material in the course of the demolition or renovation. *See* 40 C.F.R. § 61.141.

[3] To satisfy the jurisdictional threshold of the NESHAPs regulations, a demolition or renovation project must involve a facility with at least 260 linear feet, 160 square feet, of RACM (or 1 cubic meter of RACM—35 cubic feet—if the area could not first be measured, such as when a demolition occurs without a survey). *See* 40 C.F.R. §§ 61.145(a)(1)(i)–(ii), (4)(i)–(ii).

[4] All friable asbestos, except for material on a component encased in concrete and material not discovered until after demolition began, must be removed before demolition begins. *See* 40 C.F.R. § 61.145(c)(1)(ii, iii). EPA has published policies addressing this issue and interprets the regulation to require that all friable asbestos be removed prior to demolition. *See, e.g.*, Off. of Air Quality Plan. & Standards, U.S. EPA, EPA 340/1-92-013, A Guide to Normal Demolition Practices Under the Asbestos NESHAPs 1-1 (1992).

such as RACM wrapped around pipes—must be carefully lowered to the floor and cannot be

dropped or thrown. *Id.* § 61.145(c)(6). RACM must remain adequately wet until packed and

sealed in leak-tight containers. *Id.* All of these work practices are intended to prevent the release

of asbestos fibers into the air.

Third, transportation and disposal of RACM is governed by regulations found at

40 C.F.R. §§ 61.145(c) and 61.150. RACM transported from the facility must be marked with

labels stating the name of the asbestos waste generator and the location where the asbestos was

generated, and the owner or operator must maintain records regarding the shipment. *Id.* §

61.150(a)(v), (d)(1). Moreover, RACM transported from the facility must be deposited as soon

as practical at a disposal site authorized to accept asbestos. *Id.* § 61.150(b)(1).

b. **New York State Asbestos Regulations**

Each state is permitted to develop a program for the implementation and enforcement of

CAA emissions standards (i.e., discharges into the air) and other requirements of 42 U.S.C. §

7412 and submit the program to EPA for approval. The New York State Department of Labor

("NYSDOL"), by appropriate delegation, is responsible for enforcing these CAA regulations for

the State of New York.[5] *See* 40 C.F.R. § 61.04(b). New York State regulates asbestos abatement

activities per 12 N.Y.C.R.R. Part 56 (a.k.a., "Code Rule 56" or "CR56"). Those regulations,

enforced by NYSDOL, impose requirements on training, licensing, abatement methods, record-

keeping, project and air monitoring, and "variances."[6] *See, e.g.*, Kristofer Landell Plea

---

[5] However, even for delegated programs, EPA retains criminal enforcement authority along with
the delegated governmental entity.

[6] In New York, a project- or air-monitoring company can apply for a variance to the Department
of Environmental Conservation if the company believes that it will not be able to comply with all
applicable rules and regulations related to asbestos abatement. *See* N.Y. DEP'T OF LABOR,

Agreement ¶ 5(b-c) (*United States v. Landell*, 1:21-CR-0154; Doc. 3; hereinafter "Landell PA");
Laskin Plea Agreement ¶ 5(a) (*United States v. Laskin*, 1:12-CR-00067; Doc. 3; hereinafter
"Laskin PA").

### c.  Federal Occupational Safety and Health Act regulations

In addition to EPA and NYSDOL regulations, asbestos abatement activities are also
subject to regulation by the Occupational Safety and Health Administration ("OSHA"). OSHA
regulations require that individuals conducting the removal of RACM wear protective gear
during abatement activities to include properly fitted respirators and protective suits. 29 C.F.R. §
1926.1101 (2019). A project monitor and employer conducting asbestos abatement work must
perform air monitoring to accurately determine the airborne concentration of asbestos to which
its employees may be exposed. *Id.* § 1926.1101(f)(3). Such air monitoring of employees during
asbestos abatement is often referred to as "OSHA personals" and is designed to alert workers if
they are being exposed anything above minor amounts of asbestos that can be filtered by
asbestos respirators.

### 2.  Factual and Procedural Background

### a.  Relevant Entities, Initial TechCity Bidding Process, Contractor Selection

Tech City Properties, Inc. is a domestic, closely-held corporation organized under the
laws of New York. This company (and its related entities; hereinafter "TechCity") was created to
purchase, renovate, and, at times, salvage and demolish portions of 11 commercial buildings
located on a 258-acre lot at 300 Enterprise Drive, Kingston, New York ("the Site"). Defendant
Roger Osterhoudt was TechCity's "Vice President of Property Management" and was

---

*Asbestos Variances Fact Sheet*, https://dol.ny.gov/system/files/documents/2021/03/asbestos-
variances-afs-1.pdf.

responsible for, among other things, soliciting bids for demolition, asbestos abatement, and project/air monitoring; recommending such bids to TechCity's owners; and executing any selected contracts. *See* Osterhoudt Plea Agreement ¶ 5(e) (*United States v. Osterhoudt*, 1:21-CR-0122; Doc. 2; hereinafter "Osterhoudt PA"). The relevant solicitation and bidding process began in late 2014 and ran through at least July 2015. *See* Osterhoudt PA ¶¶ 5(i-k). During that time period, defendant Osterhoudt and other TechCity officers and owners solicited, and received, bids for demolition, asbestos abatement, and project/air monitoring.

On May 20, 2015, Hudson River Valley Environmental, LLC ("HRVE"; a domestic limited liability company registered with the State of New York), submitted a bid to act as "air and project monitor," for the totality of the project. *See, e.g.*, Landell PA ¶¶ 5(j); Kristofer Landell was the sole owner of HRVE and had several air monitors in his employ. *See* Landell PA ¶ 5(a). In connection with the bid, HRVE conducted an Asbestos Pre-Demolition Survey for the Site that included bulk sampling and analysis. *See* Landell PA ¶ 5(h). HRVE's survey corroborated the 2010 survey and documented the presence of at least 410,670 square feet and 6,000 linear feet of asbestos containing materials at the Site. *Id.* Defendant Osterhoudt received a copy of Landell's survey, as did Laskin. *See, e.g.*, Osterhoudt PA ¶ 5(h).

During and prior to HRVE's bid on the project, defendant Landell developed a business and personal relationship with Stephanie Laskin. *See, e.g.*, Laskin PA ¶ 5(d); Landell PA ¶¶ 5(d-f). Specifically, defendant Laskin took the supervisor training and obtained the necessary owner/supervisor licenses from New York, and with assistance from Landell, Laskin formed a company, A2 Environmental Solutions LLC ("A2ES") under the laws of New York State. *See* Laskin PA ¶ 5(a); *see also* Landell PA ¶¶ 5(d-f). Landell and Laskin originally formed A2ES to jointly bid on asbestos abatement projects, most likely in an attempt to undercut other bidders by

offering consolidated services and to minimize delays and work stoppages due to NESHAPs and NYSDOL regulations and inspections. *See, e.g.*, Laskin PA ¶ 5(d-e); Laskin Investigative Activity Report ("IAR") dated February 11, 2021 at 3–4 (attached hereto as Exhibit 1).[7] Landell also appeared as a principal on at least one "Investment Proposal," (attached hereto as Exhibit 12) which appeared on A2ES letterhead. Laskin and A2ES transferred more than $13,000.00 directly to defendant Landell between December 2014 and March 2016. *See also* Laskin PA ¶¶ 5(d), 5(t), Landell PA ¶ 5(d). This transfer was in contravention of the mandate of 12 N.Y.C.R.R. § 56-4.3, specifying that air monitors must be "completely independent of all asbestos abatement contractors involved in an asbestos project." The purpose behind this regulation is to prevent asbestos contractors from monitoring themselves and performing their own air sampling.

On August 25, 2015, a demolition contract was signed between defendant Osterhoudt and the owner of Advanced Demolition and Recycling, Jeffrey B. Laskin (defendant Laskin's brother). Osterhoudt solicited at least two asbestos abatement bids prior to selecting A2ES. TechCity rejected these proposals. At the urging of Jeffrey Laskin and Landell, A2ES submitted a bid to TechCity sometime in July 2015. *See* Osterhoudt PA ¶¶ 5(i-k). As part of the resulting negotiations, largely conducted via email, Laskin suggested to Osterhoudt that Laskin could complete the project without violations and that the presence of her "air guy" (Landell) at the Site usually got the relevant NYSDOL inspector to turn away. Laskin also made reference to the possibility of cutting "major corners" and getting "red tagged" for a much lower price. *See, e.g.*, Osterhoudt PA ¶ 5(k). Specifically, Laskin wrote: "I would love to do this job and by A2ES doing it, it will get done correctly the first time, no tagging and no delays;" "And if we get the air

---

[7] Excerpts of all IARs referenced in this filing are alphabetized and attached as Exhibit 1 hereto.

guy I suggested [Landell] as well with me that's also a major plus. [NYSDOL Inspector #1] usually sees him and turns away ☺;" and, "Lol if you want to cut major corners and get red tagged we can do that for 2.5$" per square foot of RACM; "I could do all the buildings for $725,518 if interested that's all friable and non-friable. Everything included." *See* Laskin IAR at 7; *see also* Exhibit 13 hereto.

Osterhoudt responded via email to the last exchange that he wanted "no red tags," and Osterhoudt and Laskin ultimately executed "Contract #1" for the removal of RACM from the Site for $150,000.00. *See* PA ¶¶ 5(f-h); Exhibit 13. Osterhoudt admitted during a recorded interview in January 2020 that Laskin's statement, coupled with A2ES's dramatically lower bid, "should have raised red flags with him," or words to that effect. *See* Osterhoudt Transcript at 86–87 (attached hereto as Exhibit 2).[8]

b. **HRVE's Bid, Variance Petition, and Expanded Oversight Obligations**

Osterhoudt also took Laskin's advice and formalized his agreement with HRVE to provide for project- and air-monitoring at the Site. *See* Landell PA ¶ 5(i). Per the "variance" (discussed *infra*), as well as HRVE's contract with TechCity, HRVE was obligated to conduct air sampling at various stages of the Site's asbestos abatement process, oversee that NESHAPs and NYSDOL regulations were followed during the abatement process, and provide "final clearances" to NYSDOL when a particular asbestos work area was ready to be reoccupied after the completion of an asbestos abatement. *See* Landell PA ¶¶ 5(c), 5(k).

On or about July 9, 2015, HRVE transmitted, and Osterhoudt later executed, a "proposal for air monitoring services for an upcoming asbestos project," with an estimated cost of $30,360.00 for daily monitoring and air sample analysis costs. *See* Landell PA ¶ 5(j). After

---

[8] Excerpts of all transcripts cited in this filing are alphabetized and attached hereto as Exhibit 2.

Landell was hired, Landell transmitted a "Variance Petition of [HRVE] Petitioner's Agent on behalf of TechCity Properties [No. 15-1181]" (Exhibit 9 hereto), to NYSDOL. Landell drafted that variance petition on HRVE letterhead and personally submitted the petition, requesting that NYSDOL approve certain types of relief from asbestos abatement and air monitoring regulations for work done at the Site by HRVE air monitors and "an asbestos abatement contractor."[9] Landell's request was based, in part, on the presence of "asbestos pipe insulation debris scattered throughout the area." NYSDOL rejected or modified eight of defendant Landell's fifteen requests for relief and imposed an additional requirement on HRVE and Landell (as the project monitor) that "[a] full time independent project monitor shall be on site and responsible for *oversight of the abatement contractor during all abatement activities to ensure compliance* with [12 N.Y.C.R.R. Part 56] and variance conditions and to ensure that no visible emissions are generated." *See* Variance, Exhibit 9 hereto (emphasis added).

### c.  Contract #1 and Initial Work by A2ES and Jeffrey Laskin

After executing Contract #1, defendant Laskin filed a 10-day notice with NYSDOL specifying that the abatement work was to proceed in the following segments: (1) containment would be set up in one area; (2) all asbestos in that area would be abated; (3) the area would receive appropriate clearances; and, (4) containment would be broken down. All of these steps would then take place in the next area, and so on. Once a building received a final clearance,

---

[9] Defendant Landell has taken issue with any insinuation that this variance petition was submitted on behalf of A2ES, despite the petition referencing an "abatement contractor" no less than three times. However, to the United States' knowledge, A2ES was the only asbestos abatement company that conducted such work at the Site from 2015 to 2016. HRVE and defendant Landell would have been obligated to oversee any other abatement contractors who worked at the Site during this time period, as well as prepare, maintain, and produce NYSDOL-required paperwork that would have reflected the presence of other abatement contractors. Regardless, per the variance requested, HRVE was explicitly directed to "oversee … all abatement activities" at the Site.

Jeffrey Laskin was to salvage metal from the building and then demolish the building, after which Jeffrey Laskin was to use salvage proceeds to pay A2ES and any other subcontractors. This plan did not work. Abatement did not proceed at anywhere near the desired pace, despite pressure coming from TechCity and Osterhoudt to complete the work quickly, in order to get buildings off the assessable property tax rolls. *See, e.g.*, Osterhoudt PA ¶ 5(p); *see also* Madeline Alonge Investigative Activity Report ("IAR") dated June 8, 2021 at 3 (attached hereto as Exhibit 2). The slow pace of the work interfered with the subsequent salvage efforts, escrow funding, and subcontractor payments. *See, e.g.*, Laskin PA ¶¶ 5(n-o).

Laskin initially had a modest number of core supervisors and handlers on payroll, including defendant Madeline Alonge. Eventually, Laskin hired several new crews of workers – some of whom were previously trained and had worked on other asbestos projects, and some who were new to the industry and whose training was provided for on Site by defendant Laskin (e.g., the "Albany Crew" and "Newburgh Crew"). *See, e.g.*, Madeline Alonge Plea Agreement ¶ 5(n) (*United States v. Alonge*, 1:21-CR-0136, Doc. 3; hereinafter "Alonge PA");[10] Guzman IAR at 4. These crews ran into problems almost immediately. During interviews, the workers explained that it was difficult to obtain necessary materials from defendants Laskin and Alonge, such as adequate personal protective equipment ("PPE"). *See, e.g.*, Guzman Transcript at 24; Guzman IAR at 2-3, 6-7. Receiving sufficient water for the project was also challenging. Guzman IAR at 6-7. Osterhoudt generally turned on the water each morning, but the hoses

---

[10] According to Alonge, Laskin also hired a "night crew" (composed of existing crewmembers) to continue asbestos abatement operations through the night without an air monitor present. *See* Alonge IAR at 2.

coming from the water source frequently froze, so the crew had to use "Hudson sprayers"[11] and other inadequate water sources to conduct their abatement. *See* Osterhoudt Transcript at 72.

As the project progressed, Osterhoudt increasingly and repeatedly pressured Laskin and her supervisors to work faster. *See, e.g.*, Laskin PA ¶ 5(n); Alonge PA ¶¶ 5(k, o). Laskin, in turn, applied pressure to her supervisors, particularly defendant Alonge and Stephanie Guzman, to accelerate the pace of the work. *Id.*; *see also* Guzman IAR dated December 12, 2017 at 3. These supervisors urged other supervisors and handlers to move more quickly. *Id.* at 3. Eventually, adherence to NESHAPs and NYSDOL was almost entirely abandoned, and Laskin and Alonge pushed the crews more aggressively. *Id.* at 5. When interviewed, multiple crewmembers reported that, even with their rudimentary training, the crewmembers believed the abatement was not conducted appropriately, but they did not initially have the experience to say "no" to either Laskin or Madeline Alonge. *See* Jeffrey Hess IAR dated July 5, 2018 at 2.

Between September 2015 and April 2016, NYSDOL and OSHA issued approximately seven notices of violation ("NOVs")[12] for violations including failing to operate functioning decontamination units; conducting asbestos removal operations without access to sufficient water; failing to containerize RACM waste properly; conducting asbestos abatement activities without adequate negative air pressure and with large rips in containment (thereby allowing hazardous air pollutants to escape into the community); failing to use adequate PPE (e.g., harnesses, properly fitted respirators); conducting dry removal of RACM; and allowing RACM

---

[11] Hudson sprayers are plastic containers that can be pressurized (often with a hand pump) that have a hose/nozzle; most often employed for yard work and spraying herbicides, etc. Wetting down the vast quantities of RACM present in the facility would have been impossible to do properly with these implements.

[12] Exhibit 14 hereto contains a compilation of all relevant NOVs/Narratives in chronological order).

waste to pile up inside and outside containment. *See, e.g.*, Laskin PA ¶ 5(j). During this same

time period, Laskin engaged in text message communications with Alonge and other A2ES

supervisors, which document their failure to maintain PPE, the dry removal and bagging of

RACM, and the fact that both Landell and Osterhoudt were in containment and would see bulk

quantities of RACM debris on the floor during "final visual inspections" but nonetheless would

allow containment to be broken down. *See, e.g.*, Alonge PA ¶¶ 5(i-j); Laskin PA ¶¶ 5(l-m);

Exhibit 8 hereto.

Meanwhile, defendant Landell and his HRVE air monitors were on-site regularly. In

many instances, Chelsea Alonge would be monitoring her sister, Madeline Alonge, in violation

of NYSDOL conflict of interest rules. In his Plea Agreement, defendant Landell admitted that his

air- and project-monitoring was done in violation of salient NYSDOL regulations and that

HRVE's variance-mandated oversight failed to stop the aforementioned asbestos-abatement

violations. *See* Landell PA ¶¶ 5(m-t). Furthermore, HRVE monitors provided statements and/or

testimony, establishing that the HRVE monitors would often inform defendant Landell that

certain things were not being done in conformance with the NESHAPs or NYSDOL regulations,

to which Landell would reply that he would "take it up with Laskin," or words to that effect

(Martinez IAR at 3-4). Landell would also periodically remove an HRVE air-monitor if the

A2ES supervisor complained that a work area was not passing certain inspections or otherwise

raised concerns. *See, e.g.*, Yakup IAR dated January 19, 2021 at 9. In an email to Osterhoudt,

Landell also informed him that Laskin had been operating without OSHA personals for several

weeks. *See* Landell PA ¶ 5(o).

During this same time period, A2ES, HRVE, and defendants Laskin, Landell, and Alonge

all failed to maintain accurate logbooks, as required by NYSDOL regulations. *See, e.g.*, Laskin

PA ¶ 5(w); Landell PA ¶ 5(bb); Yakup PA ¶ 5(i). Indeed, defendant Alonge provided a statement wherein she recounted being summoned to Laskin's house to fabricate logbooks and alter other records after Laskin became aware of the NYSDOL and/or EPA investigation. *See* Alonge IAR at 3. Similarly, defendant Gunay Yakup stated that Landell personally fabricated, falsified, and manipulated NYSDOL-required logbooks to make them appear complete and accurate. *See, e.g.*, Yakup PA ¶ 5(i); Yakup IAR at 54-56.

Particularly troubling is the fact that on or about March 1, 2016, Landell created and transmitted a "final air clearance" letter to NYSDOL purportedly in the name of "Seth Piker" (an air/project monitor previously affiliated with HRVE), who was not present at the Site and did not issue the clearance letter (hereinafter "the Piker letter"). *See* Landell PA ¶ 5(t). This was not a "coincidence" or simple "mistake," as defendant Landell would have this Court believe. Mr. Piker's name appears on one, and only one, final air clearance letter that occurred months into the year-long project and is dated on the same day as a NYSDOL inspection that resulted in one of the most serious NOVs.[13]

Furthermore, defendant Yakup and others have provided statements that Landell's paperwork, including clearances and logbooks, were oftentimes falsified and done after the fact. *See* Yakup PA ¶ 5(i)(iii). Yakup's claims are corroborated by HRVE's own air monitors and Landell's own emails to co-conspirators. Equally telling is the fact that Landell was directing his co-conspirators, via email, to manipulate the NYSDOL-required logbooks to withhold

---

[13] The Piker letter is not the only instance of defendant Landell using other people's names to conceal his involvement in the asbestos abatement violations at the Site. As set forth in great detail in the Declaration of NYSDOL Inspector Jason Pensabene (attached hereto as Exhibit 10), after NYSDOL shut down this Site and defendant Landell no longer had a valid license, defendant Landell was caught using the name of a music company and one of its owners to conceal the fact he was still working in the air- and project-monitoring industry.

information from NYSDOL – e.g., "[y]ou need certain things in your log for the code rule, but you also don't want to put too much in there." *See, e.g.*, Landell Plea Agreement ¶ 5(f). Defendant Landell's Piker letter, continued use of others' names on documents he prepares, non-compliant clearances, plea agreement, and emails support the fact that defendant Landell failed to properly create, maintain, produce NYSDOL-required logbooks and other paperwork and, in some cases, affirmatively fabricated and falsified such documents in furtherance of the conspiracy.

### d.  Initial Termination of the Laskins and Negotiation of Contract #2

Defendant Osterhoudt and TechCity terminated Contract #1 and fired both Jeffrey Laskin and A2ES around March of 2016. *See* Laskin PA ¶¶ 5(o-s). Neither HRVE nor defendant Landell, as owner of HRVE, were terminated. Landell emailed Osterhoudt after the Laskins' terminations and advised him that several logistical and other steps needed to be taken to secure the work area and that a new asbestos abatement (and cleanup) would be complicated by the poor work of A2ES. *See* Osterhoudt PA ¶¶ 5(p-q); *see also* HRVE Letter dated May 6, 2016 at 44; BSB Construction Letter dated May 13, 2016; Classic Environmental Letter dated May 9, 2016 (collectively attached hereto as Exhibit 3). Landell also advised Osterhoudt that HRVE would not be able to complete the work within the timetable desired by TechCity. *Id.*

Osterhoudt, on behalf of TechCity, again solicited bids from other asbestos abatement companies to remove the RACM from the Site. Thereafter, Osterhoudt received proposals for between $1,785,180.00 and $1,984,780.00, for both the cleanup of the contamination created by A2ES and the removal of the remaining RACM from the Site. *See* Osterhoudt PA ¶ 5(q). Osterhoudt and other TechCity officers again rejected these proposals as too expensive. *Id.* Osterhoudt then began negotiating with Laskin to have A2ES return to the Site to complete the

14

asbestos abatement. *See* Osterhoudt PA ¶ 5(r). On June 16, 2016, Laskin and Osterhoudt executed Contract #2, which called for the completion of the asbestos abatement at the Site for $190,000, was not dependent on salvage sales, and extended the deadline for completion to September 20, 2016. *Id.*

### e. Work Under Contract #2 and the August 2016 "Red-Tagging"

In an effort to increase the number of asbestos abatement handlers and thereby accelerate the pace of the abatement at the Site to meet the deadlines of Contract #2, Laskin hired Yakup and his crew in or around May 2016. *See* Laskin PA ¶ 5(r). Thereafter, defendants Laskin, Landell, Osterhoudt, and Yakup met to discuss the complete removal of the remaining RACM at the Site by September 2016. *Id.* ¶ 5(s). Osterhoudt repeatedly stressed that the work had to be completed by the deadline. *Id.* Both Yakup and Laskin did not believe that meeting the September 2016 deadline was possible. *See* Yakup Transcript at 81-83, 87-88, 91-93, 122-124; Landell IAR dated May 9, 2019 at 3-4. Landell offered to alter the necessary documents to reduce the amount of RACM reported on paper and suggested possible methods to circumvent abatement and monitoring requirements. *See* Landell IAR at 4. During this same time period, in an effort to conceal their ongoing illegal asbestos operations, Laskin, Landell, Alonge, and Yakup constructed "fake" or "show" containment areas, decontamination units, and negative pressure machines to deceive NYSDOL inspectors, listed supervisors as on-site when the supervisors were not, and falsified various documents. *See* Yakup PA ¶ 5(i). Despite the best efforts of the conspirators, between March and August 2016, NYSDOL issued at least four additional NOVs for a series of violations of the NYSDOL and CAA asbestos regulations. *See, e.g.*, Laskin PA ¶ 5(v). Additional text messages between Laskin and her supervisors during this period reflect the continuous nature of the disregarded violations – e.g., reference to dry removal

15

operation; lack of water on site for the abatement; the sweeping up of dry piles of RACM debris;[14] "mountains" of dry RACM debris on the floor; improper disposal procedures; and the anticipated premature running of final air clearances. *See, e.g.*, Laskin PA ¶ 5(m). When asked why she participated in these clear violations, one A2ES supervisor responded that Laskin told the A2ES supervisor that she had to cut corners or otherwise lose her job. *See* Guzman Transcript at 33. That same supervisor also stated that handlers sometimes filled bags with dry RACM and then added water before closing the bags to make it look like the RACM had been removed properly (when wet). *See* Laskin PA at ¶ 5(j). Laskin was not only aware of the fact her supervisors and employees were conducting dry-removal operations (*id*. ¶ 5(v)), she actively participated in dry removal herself. *See* Alonge PA ¶ 5(q).

In July 2016 Landell emailed Osterhoudt that he "[did not] see them finishing" by the deadline "regardless [of] what Stephanie says." Landell attempted to expedite the project by failing to report violations and by issuing final clearances that were never conducted. For example, HRVE's own air-monitors provided statements that Landell, upon learning that one of his air monitors had flunked a final visual inspection, summoned the air monitor to the Site and summarily told his air monitor to leave late in the afternoon. *See* Chelsea Alonge Audio Recording at 121:00.[15] When that same air monitor returned to the Site the following morning, the air monitor observed that the work area was not only cleared, but containment was broken down, and the abatement crew had moved to another area. *Id.* HRVE's air monitor further stated that she learned that defendant Landell cleared those areas overnight, although the requisite

---

[14] Dry removal and handling of RACM is prohibited per 40 C.F.R. § 61.145(c)(2)–(3), and RACM must remain wet until containerized.

[15] This audio recording can be made available to the Court upon request.

timetable for re-cleaning, drying, and re-testing could not have been properly followed. *Id.* This vignette demonstrates that Landell fraudulently cleared the work area himself without ensuring that the area was in fact free of asbestos debris.

The problems at the Site came to a head on August 1, 2016, when, according to Yakup (PA ¶ 5[j]), he and defendants Laskin, Landell, and Osterhoudt met at the Site, in the uncontained work area (where abatement work was nonetheless occurring). Osterhoudt demanded that the remaining RACM be removed by the end of the day and that the building be demolished the following week. *Id.* Yakup responded, in sum and substance, that it would not be possible to "clear" the area according to the NESHAP and NYSDOL regulations, as there was still RACM in place and RACM debris on the ground. *Id.* Landell told the meeting participants that Landell could nonetheless clear the area if the abatement workers removed a fraction of the RACM on specific pipes. *Id.* They also decided to sweep up the dry RACM on the ground using brooms. *Id.* Yakup instructed his crew to carry out the work as directed by Laskin, and left the Site. *Id.* Not surprisingly, Landell disputes this version of events, claiming that when he arrived on Site that morning, dry removal operations were in progress, and Landell was the one who summoned NYSDOL to the Site.

Regardless, NYSDOL did inspect the Site. During the inspection, NYSDOL inspectors noted, *inter alia*, a dry removal in progress, RACM debris all over the floor of the work area, and asbestos handlers harnessed to the rafters in an effort to hide from the inspectors. *See* Exhibit 14 (8/1/2016 NOV). One of the asbestos handlers was confirmed to be a worker on the Yakup crew, who later admitted in a recorded interview that he engaged in dry removal. *See id.* NYSDOL also found a number of other violations on August 1, 2016, including: missing critical barriers throughout the work area; insufficient negative air pressure; asbestos handlers who did not have

17

licenses (or whose licenses were expired); a lack of water in the decontamination unit; waste bags that were not decontaminated or labeled; bulk quantities of RACM waste piled into an unlined trailer; and the lack of any project logs available on Site. *Id.* Finally, the asbestos abatement work proceeded that day without an air monitor present. *Id.* Based on these violations and the history of problems at the Site, NYSDOL red-tagged the project; meaning, NYSDOL closed the project down, prohibited further work, and posted notice of the violations on the outside of containment. Exhibit 4 hereto contains representative photographs, showing the extent of the asbestos contamination found at the Site.

The NYSDOL inspectors who closed down the site on August 1, 2016, directly advised defendants Landell, Laskin, and Osterhoudt not to let anyone conduct any additional work on Site. *See, e.g.*, Landell PA ¶ 5(aa). When the inspectors arrived at the Site again on Monday, August 5, 2016, however, the inspectors discovered evidence that people had been working in containment over the weekend. Specifically, a scissor lift that had been in containment when the project was shut down—and which, therefore, should have remained in place—had been moved out of containment. Tread tracks in the dust showed the path the scissor lift had taken when moved from containment. *See* Exhibit 4. Having been in containment, the scissor lift had to be decontaminated because of RACM debris, so moving the lift out of containment was a health hazard, in addition to the fact that removing the lift was a direct violation of the stop-work order. Defendant Alonge later stated during an interview that defendant Laskin directed her and Yakup back into containment to remove various materials. *See* Alonge IAR at 4-5.

f. **The Investigation**

EPA's Criminal Investigation Division ("EPA-CID") initiated this investigation, in part, due to NYSDOL's red-tagging of the Site and the severity of the NESHAPs violations

18

discovered on August 1, 2016. EPA obtained authority to conduct a consent search at the Site on August 25, 2016, at which time EPA took photographs and samples. The NEIC Report (attached hereto as Exhibit 5) documented conditions at the Site with numerous photographs and bulk samples, many of which tested positive as RACM.

On August 21, 2017, EPA-CID agents conducted a voluntary interview with defendant Laskin, which was recorded, wherein Laskin admitted that she had three totes/bins of A2ES business documents at her residence and in her car. *See* Laskin First Transcript at 42. Shortly thereafter, a federal Grand Jury subpoena *duces tecum* was served upon Laskin for the production of A2ES's business-related documents. The subpoena had a return date of September 21, 2017. Laskin indicated she understood and would comply with the subpoena (Laskin August 2017 IAR at 1). Two days before the deadline of the subpoena, the EPA-CID case agent e-mailed Laskin at both her personal and business e-mail addresses, asking about the subpoena documents to see if she needed additional time to produce the documents. (Laskin October 2017 IAR at 1). Laskin did not respond.

On October 27, 2017, defendant Laskin spoke with the EPA-CID agents and told them she "had nothing to give to [them]." (Laskin November 2017 IAR at 1). On March 13, 2018, a search warrant was executed at Laskin's home and on her vehicle. In the interview of Laskin during the execution of that warrant and while discussing the various documents relating to the Site (i.e. dump tickets), Laskin admitted that she had copies of said documents. The EPA-CID agents located the dump tickets Laskin had failed to produce (along with other documents). When confronted with the responsive A2ES business documents found during the search warrant and asked why she did not produce them, Laskin, in sum and substance, claimed: "Cause I just forgot, and it was really nothing in there..." Laskin Third Interview Transcript at 29. In a

subsequent interview, Laskin stated that she was "overwhelmed and scared," or words to that effect (Laskin 2021 IAR at 6).

g.  **Legal Proceedings to Date and Identification of Victims**

Between March 30, 2021, and June 8, 2021, the above-captioned defendants all entered guilty pleas. With the exception of defendant Osterhoudt, who pled guilty to a misdemeanor violation of 42 U.S.C. § 7413(c)(4), all other defendants pled guilty to felony violations of 18 U.S.C. § 371. Following the March 30, 2021, guilty plea by defendant Yakup, the United States filed a "Motion for Alternative Victim Notification" pursuant to 18 U.S.C. §§ 3771(d)(2), for authorization to employ an alternative victim notification procedure, which included a press release.

Since the publication of that Crime Victim Rights Act ("CVRA") notice, the United States has identified approximately 151 potential victims thus far, either through payroll and other records searches, or based on responses to the CVRA alternative notifications. These individuals are members of the community who may have been exposed to asbestos as a consequence of the defendants' failures to properly contain asbestos abatement operations, prevent visible emissions, and properly dispose of RACM.

EPA has also been forced to undertake a taxpayer-funded cleanup at the Site pursuant to its "Superfund" authority. *See generally* 42 U.S.C. §§ 9604, *et seq*. To date, EPA has incurred approximately $399,783.52 in "direct" response costs. *See* SCORPIOS Report (attached hereto as Exhibit 6).

3.  **Applicable Legal Standards at Sentencing**

A sentencing court may adopt the factual findings set forth in a presentence report without specifically reciting the relevant facts or providing further analysis. *United States v.*

*Ahders*, 622 F.3d 115, 119 (2d Cir. 2010); *United States v. Watkins*, 667 F.3d 254, 266 (2d Cir. 2012). A presentence report is considered "adequate" if the presentence report "states enough facts to permit meaningful appellate review," *United States v. Pristell*, 941 F.3d 44, 51 (2d Cir. 2019), and the defendant has not made an affirmative showing that the information the presentence report contains is inaccurate. *See id.* at 54 (concluding that the defendant "merely fault[ed] the [presentence report] . . . for failing to make explicit findings," which was not enough to affirmatively show that the sentencing court erred in adopting certain findings in the presentence report); *United States v. Terry*, 916 F.2d 157, 162 (4th Cir. 1990) ("A mere objection to the finding in the presentence report is not sufficient. The defendant has an affirmative duty to make a showing that the information in the presentence report is unreliable, and articulate the reasons why the facts contained therein are untrue or inaccurate.").

In determining the appropriate sentence to be imposed upon a defendant convicted of a criminal offense, a court may conduct a broad inquiry "largely unlimited either as to the kind of information [the court] may consider, or the source from which [the information] may come." *McClain v. United States*, 676 F.2d 915, 918 (2d Cir. 1982) (citing *United States v. Tucker*, 404 U.S. 443, 446-47 (1972)). Such inquiry naturally includes the conduct for which the defendant was convicted, but it also includes other conduct relevant to the crime. *See id.* at 919 (holding that the court did not abuse its discretion or err in its sentencing by considering the defendant's character, behavior, and criminal history); *Phan v. McCoy*, No. 94-CV-1596 (RSP/GJD), 1997 WL 570690, at *6 (N.D.N.Y. Aug. 28, 1997) ("[A] sentencing judge has discretion to consider virtually any kind of information (citing *United States v. Lee*, 818 F.2d 1052, 1055 (2d Cir.1987)); *see, e.g.*, *United States v. Romano*, 825 F.2d 725, 728 (2d Cir. 1987) (considering

uncharged conduct); *United States v. Montgomery*, 262 F.3d 233, 249 (4th Cir. 2001)

(considering acquitted conduct).

Moreover, regarding the evidence presented by the United States, hearsay has long been

admitted as a basis for a court's sentencing determinations, and a court may properly consider

uncorroborated hearsay statements to sentence defendants. *See Romano*, 825 F.2d at 728 (2d Cir.

1987) (holding that the wide range of evidence presented by the government at trial and in the

pre-sentence report—albeit hearsay—was within the court's discretion to consider); *United*

*States v. Reese*, 33 F.3d 166, 174 (2d Cir. 1994) (holding that the court "was entitled to rely on

[the facts] as summarized by the government in the absence of an indication that [the facts] were

incorrect"); *United States v. Streich*, 987 F.2d 104, 107 (2d. Cir. 1993) ("In any event, this circuit

allows the consideration of hearsay testimony at sentencing").

Accordingly, the Court may properly consider at sentencing an agent's testimony about

witness statements made during interviews by the agent. *See United States v. Pugliese*, 805 F.2d

1117, 1123 (2d Cir. 1986) (referencing "the Supreme Court's lesson in [*Williams v. People of*

*State of N.Y.*, 337 U.S. 241, 245, 69 S. Ct. 1079, 1082, 93 L. Ed. 1337 (1949)] that sentencing

courts should not abandon the practice of considering out-of-court sources of information"

regarding a Secret Service agent's testimony to a conversation with a witness); *United States v.*

*House*, 551 F.3d 694, 698-99 (7th Cir. 2008). Courts may also properly admit and consider an

agent's report to find sentencing facts. *See United States v. Reed*, 744 F. App'x *16, *18 (2d Cir.

2018) (holding that the sentencing court made "an appropriate evidentiary finding" in

considering the defendant's conduct described in the government's presentence report)

(unreported); *see also United States v. Booher*, 242 F.App'x 952, 954 (4th Cir. 2007)

(unreported).

## APPLICATION OF THE SENTENCING GUIDELINES

1. **Guidelines Calculations**

The government has no objections to the applicable guidelines range as set forth in the presentence investigation reports ("PSRs") or the plea agreements.

2. **Criminal Fine**

The United States has no objections to the fine ranges set forth in the PSRs. Further, the United States submits that all restitution owed by the defendants should take primacy over any criminal fine the Court may choose to impose.

3. **Restitution**

   a. **The Primary Purpose of Restitution is to Compensate Victims Like Those in this Case – i.e., the Environmental Protection Agency and Individual Members of the Community, who were Potentially Exposed.**

As noted above, restitution in this case falls into two general categories: (1) medical costs imposed on individuals in the surrounding community, who were potentially exposed to hazardous air pollutants; and, (2) monies owed to EPA in connection with the cleanup of the Site, which was necessitated by asbestos contamination. Approximately 151 potential victims have thus far been identified by the United States. As set forth in Exhibit 7 hereto, the costs associated with screening and compensating those individuals are currently estimated to be as high as $79,500.00.[16] Regarding the second category of restitution owed to EPA, those costs are currently estimated to be $607,658.04.

Supreme Court precedent unequivocally reflects that the primary purpose of the restitution statutes is to compensate victims of crimes, including both individuals and

---

[16] In addition, three of these victims have already incurred medical and other expenses as a result of their asbestos exposure. As of the date of this memo, the government has received documentation from these victims totaling $1861.75.

23

governmental entities. *See, e.g., Dolan v. United States*, 560 U.S. 605, 612-13 (2010). The

Second Circuit has further recognized that "'the purpose behind 18 U.S.C. §§ 3663-3664 is to

'require full restitution wherever possible.'" *United States v. Mattice*, 186 F.3d 219, 231 (2d Cir.

1999) (quoting *United States v. Porter*, 90 F.3d 64, 68 (2d Cir.1996), *United States v. Atkinson*,

788 F.2d 900, 903 (2d Cir.1986)). Indeed, "full restitution remains the norm, sparing the victims

the need to get a separate civil judgment." *Id.* Accordingly, EPA and the approximately 151

individuals identified to date, should be provided restitution and should not be forced to seek

recourse through the civil process.

### b.  Restitution is Mandatory per 18 U.S.C. § 3663A

Restitution in this case is mandatory, as 18 U.S.C. § 3663A (a.k.a., "the Mandatory

Victims Restitution Act" or "MVRA") requires sentencing courts to "order . . . that the

defendant[s] make restitution to the victim[s] of the offense," where the conviction involves "any

offense that is an offense against property." *See* 18 U.S.C. § 3663A(c)(1)(A)(ii). Here, EPA may

be considered a "victim" for the purposes of awarding restitution, as EPA has been "directly and

proximately harmed as a result of the commission of an offense for which restitution may be

ordered including, in the case of an offense that involves . . . a conspiracy . . . any person directly

harmed by the defendant's criminal conduct in the course of the . . . conspiracy." 18 U.S.C. §

3663A(a)(2); *see, e.g., United States v. Phillips*, 367 F.3d 846, 863 (9th Cir. 2004) (holding that

EPA was a "victim" for restitution purposes where EPA incurred site characterization and

cleanup costs when the defendant in a Clean Water Act prosecution damaged the site). Circuit

courts have held that cleanup costs incurred as a result of a defendant's actions are properly

considered "losses" under the MVRA. *See United States v. Sawyer*, 825 F.3d 287, 292-96 (6th

Cir.) (discussing cases), *cert. denied*, 137 S.Ct. 386 (2016); *United States v. Brock-Davis*, 504

24

F.3d 991, 994, 996-98 (9th Cir. 2007) (same). Indeed, even the defendants in this case have all

agreed that the MVRA applies and that at least EPA is entitled to restitution under its provisions.

*See, e.g.*, PAs ¶¶ 1(d), G.

Even if this Court determines that 18 U.S.C. § 3663A's mandatory provisions do not

apply, restitution is still appropriate. In *Porter*, the Second Circuit noted that, when considering

discretionary restitution under 18 U.S.C. § 3663(a), "the sentencing judge must consider at least

three factors before restitution can be imposed: the amount of the loss sustained by the victim of

the crime, the defendant's ability to pay restitution, and the financial needs and earning ability of

the defendant and the defendant's dependents." *Porter*, 90 F.3d at 67. Here, the actions of the

defendants are substantial: a six-figure, taxpayer-funded hazardous materials cleanup and the

potential exposure of approximately 151 unwitting members of the community. Some of the

defendants do have dependents, but that fact alone is not a basis to deny restitution to the

community. As to the defendants' ability to pay, other filings in this case detail some assets held

by the defendants, and apportionment is an option in this case pursuant to 18 U.S.C. § 3664(h)

(*see infra*).

     c.   **The Total Amount of Restitution Must be Calculated Regardless of Economic Circumstances**

Once the Court determines that restitution is appropriate under either section 3553(a) or

3553A, the total amount of restitution must be calculated regardless of the defendant's ability to

pay (*see* 18 U.S.C. § 3664(f)(1)(A)). Where there are multiple defendants responsible for the

losses (as there are here), the Court may "make each defendant liable for payment of the full

amount of restitution or may apportion liability among the defendants to reflect the level of

contribution to the victim's losses and economic circumstances of each defendant." *Id.* §

3664(h).

d. **United States' Recommendations for Apportionment**

In recognizing that "more than one victim has sustained a loss requiring restitution by a defendant, the Court may provide for a different payment schedule for each victim based on the type and amount of each victim's loss and accounting for the economic circumstances of each victim." 18 U.S.C. § 3664(i). Accordingly, for the reasons set forth below, the United States recommends that medical screening costs should be imposed jointly and severally on all defendants, while EPA's response costs should be apportioned amongst only the ownership defendants (i.e., defendants Laskin, Landell, and Osterhoudt). Likewise, as reflected in the statute, the United States recommends that EPA's losses not be addressed until after "other victims receive full restitution." *See* 18 U.S.C. § 3664(i).

i. **Medical Screening Costs of Potentially Exposed Members of the Community Should be Imposed Jointly and Severally on the Defendants.**

All five defendants were "owners and operators" pursuant to the CAA and have admitted as much in their plea agreements. For instance, defendants Yakup and Alonge were supervisors of an asbestos-abatement crew and received New York State certified training that advised them regarding the safe handling and removal of regulated asbestos containing materials ("RACM"), containment, wet-removal, etc. Defendant Laskin was likewise trained and accredited as a supervisor but was also licensed to operate an asbestos-abatement business. Defendant Landell was an air and project monitor, who was responsible for, *inter alia*, ensuring that all CAA and New York State asbestos regulations were followed at the Site. Lastly, defendant Osterhoudt was a property manager for the company that owned the facility where the asbestos crimes occurred.

Accordingly, all of these individuals were informed of the presence of RACM at the Site (either via personal observations or via surveys/NOVs) and were trained in the safe handling and

26

disposal of RACM. Therefore, these individuals violated their responsibilities by allowing

breaches in containment, using non-functioning equipment, failing to containerize RACM, and

otherwise creating conditions that allowed for hazardous air pollutants to escape the work area

and migrate into the surrounding community. All defendants breached their duties and all

contributed to releases that have imposed health risks on potentially exposed individuals.

Pursuant to 18 U.S.C. § 3664(h), all defendants should be held jointly and severally liable for the

approximately $79,500.00 that will likely be required to properly address the health risks the

defendants collectively imposed on the public. As to the economic circumstances calculation

required under the same provision, these health monitoring/screening costs are an order of

magnitude lower than EPA's response costs, and the defendants, collectively, have the ability to

pay that amount.

Accordingly, with respect to restitution for potentially exposed members of the

community, the United States recommends that all defendants be ordered to jointly pay

$2,900.00 each (amounting to a total of $14,500.00[17]) into the Court within one week of

sentencing. This escrowed money will, in-turn, fund a two-tiered screening process to be

facilitated by Finger Lakes Occupational Health and Emblemhealth. More specifically, the Court

can use this escrowed money to pay these clinicians to formulate a questionnaire that would be

distributed to potential victims, facilitate an informational session for potentially exposed

individuals, evaluate the questionnaires, and make recommendations for individuals who (based

on the questionnaires) require more involved medical screening. Within the 90-days

countenanced by 18 U.S.C. § 3664(d)(5), those clinicians will provide the Court a report

_____

[17] Exhibit 7 hereto provides the clinicians' cost estimates.

outlining which individuals need additional, baseline medical screening and provide a cost estimate to the Court (approximately $260/person). The Court can evaluate these reports and amend the restitution order to direct the defendants to pay any additional required monies (up to $52,000.00) within an additional 90-days.

### ii. EPA's Response Costs Should be Paid by the Ownership Defendants

In contrast to the first category of costs, EPA's response expenditures can be apportioned to the three individuals who directed the disposal of the RACM waste at the Site: defendants Laskin, Landell, and Osterhoudt. Defendants Yakup and Alonge, on the other hand, were not in a position to direct the disposal of RACM off-site. As floor-level supervisors who solely oversaw the removal and containerization of RACM during abatement operations, Yakup and Alonge did not have the authority to contract with waste transport, disposal, or landfill companies. Whereas, defendants Laskin, Landell, and Osterhoudt, as owners, did have the authority and did make those decisions.

Additionally, the ownership defendants have significantly more assets than defendants Yakup and Alonge. Pursuant to 18 U.S.C. § 3664(i), Laskin, Landell, and Osterhoudt were the parties responsible for contaminating the Site and necessitating the six-figure, taxpayer-funded cleanup, and those in the best position to pay for the resulting pollution. Accordingly, the United States recommends that the ownership defendants be held jointly and severally liable for EPA's $607,658.04 in direct response costs and further recommends that the Court fashion a payment schedule during any term of supervised release or probation after all medical monitoring costs have been paid into the Court.

28

## ANALYSIS OF § 3553(a) FACTORS

Based on all of the information before the Court, the government respectfully requests that the Court impose a sentence consistent with the federal sentencing guidelines and statutory maximums for all defendants. Moreover, under the facts present here, terms of imprisonment within the applicable guidelines range will be sufficient but not greater than necessary to comply with the sentencing purposes in 18 U.S.C. § 3553(a)(2).

1. **Nature and Seriousness of the Offense**

Among those factors related to determining the length of a defendant's sentence are the nature and circumstances of the offense and the need for the sentence imposed to reflect the seriousness of the offense. 18 U.S.C. §§ 3553(a)(1), (2)(A). Here, the seriousness of the offense should again be carefully evaluated by the Court, given the significant health and environmental harms caused by the defendants.

a. **The Dangers of Asbestos Generally**

Asbestos is a "listed" hazardous substance and hazardous air pollutant. *See* 42 U.S.C. § 7412(b)(1) and 40.C.F.R. § 302.4. The Word Health Organization has concluded that "[a]sbestos is a proven human carcinogen. No safe level can be proposed for asbestos because a threshold is not known to exist." World Health Org. Reg'l Off. for Eur., *Air Quality Guidelines for Europe*, at 133 (2d ed. 2000). The EPA and the International Agency for Research on Cancer have also determined that asbestos is a human carcinogen. AGENCY FOR TOXIC SUBSTANCE & DISEASE REGISTRY [ATSDR], CAS#: 1332-21-4, PUBLIC HEALTH STATEMENT ASBESTOS 5 (Sept. 2001).

Asbestos exposure can cause changes to the membranes surrounding the lung and has the potential to cause a number of lung diseases, including asbestosis,[18] lung cancer, and mesothelioma[19] (a cancer of the membrane surrounding the lungs). *See, e.g.*, Int'l Programme on Chem. Safety [IPCS], World Health Org. [WHO], Rep. on Environmental Health Criteria 203: Chrysotile Asbestos §1.6 (1998), http://www.inchem.org/documents/ehc/ehc/ehc203.htm. The latency period for asbestos-induced lung cancer is ten to forty years. ATSDR, at 49.

b. **The Defendants Were Aware of the Dangers of Asbestos and Willingly Exposed People to Such Risk for Profit.**

As explained above, the offenses committed by the defendants in this case consist of deliberate misconduct, involving a substance that defendants knew to be harmful by virtue of the fact that the defendants all received training that included a comprehensive discussion of the health risks discussed above. The defendants' conduct was not a hyper-technical violation of complicated regulations; their conduct placed unsuspecting individuals in grave danger. As

---

[18] Asbestosis is a slow buildup of scar-like tissue in the lungs and in the membrane that surrounds the lungs. The scarred tissue loses its flexibility which makes breathing difficult. The scarring may also reduce blood flow to the lungs which, in turn, can cause enlargement of the heart. The outward symptoms of asbestosis include shortness of breath, cough, abnormal breathing sounds, and decreased lung capacity. Asbestosis can eventually lead to disability and, in severe cases, death. ATSDR, *Public Health Statement Asbestos* at 4; ATSDR, *Toxicological Profile for Asbestos* at 39. Asbestosis can take ten to twenty years to develop and may progress "long after exposure has ceased." ATSDR, *Toxicological Profile for Asbestos* at 41.

[19] Mesothelioma is a form of cancer that affects the membrane surrounding the lungs. It is rare in the general population and is associated specifically with asbestos exposures. Cases of mesothelioma have been reported in individuals who have been occupationally exposed to asbestos, in individuals whose exposure was paraoccupational, and in individuals who were exposed environmentally. ATSDR, *Toxicological Profile for Asbestos* at 52–53. Symptoms generally develop thirty to fifty years after exposure and may include shortness of breath, pain in the chest, weight loss, abdominal pain and swelling, and blood clotting abnormalities. As the cancer spreads it may cause trouble swallowing and swelling of the neck and face. National Cancer Institute, *Fact Sheet: Mesothelioma: Questions and Answers* (2002) available at http://www.cancer.gov/cancertopics/factsheet/Sites-Types/mesothelioma .

explained herein *infra,* the United States has already identified at least 151 individuals, and

perhaps more, who were potentially exposed to airborne asbestos at the Site during the salvage

and demolition project. The defendants' awareness of the dangerousness of their actions and the

subsequent consequences of their callous disregard for environmental and public health

regulations is accurately reflected in their own text exchanges.

> S.G.: Is there any filters here?
> S.G.: Is there any filters here?
> S.G.: Is there any filters here?
> [...]
> S.G.: Which mask should I take filters off there's none of them
>         Should I check the garbage?
> Laskin: No
> S.G.: U got Maddy [Alonge] talking death over here
> [...]
> S.G.: Ima save these messages so when I get sick I can sue you

One, and only one, consideration drove the defendants in this case – money. These defendants

were willing to put the health, welfare, and safety of unsuspecting individuals at risk to save

costs and turn a profit.

Courts have sentenced defendants to substantial terms of imprisonment in asbestos cases

similar to the case at bar. Most pointedly, in *United States v. Sawyer*, *et al*., No. 2:11-CR-82,

2013 WL 1702642 (E.D. Tenn. Jan. 19, 2013), a case strikingly similar to the case at bar, Judge

Greer sentenced five defendants to substantial terms of incarceration for conspiracy charges

related to asbestos violations (including the statutory maximum for the lead defendant). There,

the United States prosecuted site owners, managers, and operators for a lengthy salvage and

demolition operation at a dilapidated industrial facility. As is the case here, the defendants in

*Sawyer* were aware of the presence of RACM, disregarded NESHAP regulations, illegally

removed RACM (to include dry removal), and took efforts to mislead the inspectors and

31

investigators. All defendants in *Sawyer* entered into pretrial plea agreements. Notwithstanding their acceptance of responsibility, Judge Greer noted that asbestos crimes of this nature are analogous to violent crimes, insofar as they resulted in the exposure of individuals to carcinogenic substances that cause lifelong impacts on the victims' health. Accordingly, Judge Greer imposed terms of incarceration ranging from 6 to 60 months as well as restitution in the amount of more than $10 million.[20] *See also United States v. Mancuso*, No. 08-CR-611, 2010 WL 11530536 (N.D.N.Y. June 8, 2009) (sentencing three owners and operators of an asbestos abatement company who conducted "rip-and-runs" to between 24 and 60 months incarceration); *United States v. Yi*, 2:10-CR-00793-PA-1 (C.D. Cal. June 7, 2011) (sentencing owner and operator of renovation project to 48 months after being convicted conspiring to violate the CAA, for failure to provide authorities notice of his intention to remove asbestos, and for violating several mandatory work practice standards); *United States v. Knapp*, No. 4:10-CR-00025 (S.D. Iowa Mar. 18, 2011) (imposing a 41-month sentence on the owner of building who hired unwitting vulnerable workers to engage in illegal renovation operations involving asbestos); *United States v. Starnes*, 583 F.3d 196 (3d Cir. 2009) (convicting abatement contractors of CAA violations, who were hired to remove asbestos from a building scheduled for demolition).

2. **History and Characteristics of the Defendants and the Risk of Recidivism**

   a. **Defendants Laskin, Landell, Alonge, and Osterhoudt**

   Concededly, these defendants have limited criminal histories. However, this lack of criminal history is already accounted for in the aforementioned U.S.S.G. calculations. Moreover,

---

[20] Press Release No. 15-081, U.S. Dep't. of Just., Owners & Managers of Former Salvage Operations at Former Textile Plant in Tennessee Sentenced to Prison for Conspiracy Associated with Illegal Asbestos Removal (Jan. 22, 2015), https://www.justice.gov/opa/pr/owners-managers-former-salvage-operations-former-textile-plant-tennessee-sentenced-prison.

the crimes to which the defendants pled guilty were not short-term aberrations and isolated instances of criminal conduct. Their actions constitute a year-long criminal endeavor, resulting in more than ten NOVs that document dozens of NESHAPs and NYSDOL regulatory violations, numerous efforts to conceal their crimes and falsify documents (before, during, and after the onset of the federal criminal investigation), and the repeated release of hazardous air pollutants into the unsuspecting community.

### b. Defendant Yakup

By contrast, defendant Yakup has a substantial criminal history. Narcotics offenses can sometimes be attributed to a substance abuse problem, which may or may not be the case here. The United States recommends that drug treatment be a part of any sentence fashioned by the Court. More troubling is that some of Yakup's offenses took place *after* he knew he was under federal investigation. Nonetheless, the United States does believe the U.S.S.G. criminal offense category calculation sufficiently accounts for this conduct.

### 3. Promoting Respect for the Law

Overall, and also relevant on the issue of deterrence, the defendants' conduct undermined a complex regulatory structure, the foundations of which rely on self-reporting and completing paperwork (e.g., log books and clearances) reliably and accurately and making such documents available for inspection. As discussed above, both the CAA and NYSDOL regulations provide that extensive paperwork must be generated, properly maintained, and made available for inspection. The purpose of this mandate is to provide inspectors and regulators with an accurate picture of how the responsible parties are handling and managing hazardous materials during the course of a project. The defendants flouted those responsibilities. Documents were not maintained (*see, e.g.,* Laskin PA ¶ 5(w)), were fabricated out of whole cloth (*see, e.g.,* Yakup PA

¶ 5(i), Alonge IAR at 3-4), and were evidently kept outside "under a tree" or "maybe in a trailer." *See* Alonge IAR at 3; Laskin 2021 IAR at 5, 19; Stephanie Laskin Second Interview Transcript at 6, 20; Stephanie Laskin First Interview Part One Transcript at 37, 39; Stephanie Laskin Third Interview Transcript at 38. Behavior of this kind is the textbook definition of a *Klein* conspiracy, insofar as the defendants' conduct impaired and impeded the responsibility of EPA and NYSDOL to safeguard the public from being exposed to a hazardous air pollutant. With respect to specific defendants, each individual had specific roles and carried out specific actions that reflect varying degrees of disrespect for the law.

### a.   **Defendants Laskin and Landell**

These two individuals are the most culpable members of this criminal scheme. Their conduct in connection with this case demonstrates a fundamental disrespect for environmental and public health regulations, as well as the defendants' efforts to manipulate the judicial process. Defendants Laskin and Landell were the primary manipulators who have tampered with paperwork, withheld documents, lied to investigators, and attempted to minimize their accountability or shift the consequences of their actions to others. In defendant Laskin's own words, however, the co-conspirators in this case, "were all manipulating each other," to their own ends.

As this year-long investigation has shown, defendants Laskin and Landell manipulated one another for personal and financial reasons in forming and operating A2ES. Laskin and Landell further manipulated TechCity by underbidding an asbestos abatement project that neither of them intended to conduct properly. Perhaps most significantly, defendant Laskin then manipulated Alonge, the person she viewed as "like a daughter," or "little sister." *See* IAR of Madeline Alonge at 2. Laskin designated this then-teenager as her "right hand woman," (*id*. at

34

4),[21] to oversee asbestos abatement activities and to be her "eyes and feet," inside containment (*see* IAR of Stephanie Laskin dated January 29, 2021 at 1), and then pressured and directed workers to violate federal and New York State asbestos regulations (*see, e.g.*, Laskin PA ¶¶ 5(j), 5(l), 5(n) 5(u), 5(v)). When the RACM needed to be disposed of in the cheapest way possible, defendant Laskin manipulated Alonge again into assisting her with illegally disposing of materials at the Newburgh landfill (a facility not approved to accept such hazardous materials). *See* Alonge IAR at 6. More specifically, Laskin directed Alonge to assist her with removing, or otherwise obscuring, the "asbestos" labels from the RACM waste, and then refused to get out of the car. *Id.*

In August 2016, when NYSDOL inspectors discovered the Site conditions, Laskin summoned one of her other supervisors, defendant Yakup, back to the Site to take the blame, and promised him legal representation. Laskin then sent a series of text messages trying to get Yakup to relay details of the inspectors' investigation. *See, e.g.*, Laskin PA 5(v)(iv)(5); Yakup Transcript at 35; Yakup PA ¶ 5(v)(iv)(5). After NYSDOL inspectors decided to "red-tag" the Site and advised the defendants that no workers were to enter containment, defendant Laskin directed workers back into containment to remove evidence and change conditions. *See* Alonge IAR at 6. When defendant Laskin became aware of the federal investigation, she was only too fast to blame Alonge, saying if things went wrong, Madeline Alonge would have known. *See, e.g.*, Laskin IAR at 9-10. Laskin also summoned Alonge to Laskin's home after the execution of the search warrant to "make up logbooks" that ostensibly had not been properly maintained. *See* Alonge IAR at 3-8. Laskin then attempted to further manipulate the situation by providing

---

[21] Text message exchanges also bear out this relationship. Exhibit 8 hereto contains excerpts of these exchanges.

numerous incomplete and, in some cases, false statements to EPA-CID agents, and withheld
documents responsive to the Grand Jury subpoena. Furthermore, during the pendency of the
investigation, defendant Laskin repeatedly told Alonge (and others) that she would provide her
legal counsel. *See* Alonge IAR at 7. Only *after* Laskin addressed her own criminal liability via
the PA did she advise Alonge that "her lawyer was only helping her" and "blew off" Alonge
when Alonge was served with a target letter. *Id.* Laskin's delay and refusal to assist her co-
worker was ostensibly an effort to prevent defendant Alonge from cooperating with federal
authorities until defendant Laskin could manage her own liability.

Most recently, in her Sentencing Memo (Doc. 18), defendant Laskin goes to great length
to minimize her involvement, shifts blame to others, and comes very close to back-tracking on
the stipulations in her PA. For instance, defendant Laskin now claims that she "lacked the intent"
to break the law because she was ignorant of the asbestos regulations and was "in over her head."
This is in stark contrast to paragraphs 1 and 4 of her PA in which she agrees to plead guilty to a
conspiracy, one of the elements of which is that she "joined the … conspiracy knowing of its
objective to commit an offense against and to defraud the United States …"  If her plea was not
conclusive on this point, there are more than a dozen NOVs (Exhibit 14 hereto) that were issued
over the course of a year advising her of the specific laws she and her employees were violating
and how to correct them. In her Sentencing Memo, defendant Laskin goes on to protest that she
"wasn't in charge," or words to that effect. This too is contradicted by the terms of her PA which
states that she was "an 'asbestos abatement contractor' and 'supervisor'," and took extensive
supervisor training through the NYSDOL. *See* Laskin PA ¶ 5(a). The defendant also formed and
owned A2ES and hired numerous other supervisors and workers over the course of the year. All
issues were brought to her attention and she was well aware of what was going on inside

36

containment as evidenced by her text exchanges with her various supervisors. *See, e.g.*, Exhibit 8 hereto (discussing sweeping, lack of PPE, debris everywhere, and that Laskin was "sorry" to be putting supervisors in a bad position). Defendant Laskin attempts to further minimize her ownership and supervision of A2ES by submitting letters of support by people who do not think she should be held to account for the actions of her employees. It bears mentioning that none of the individuals arguing on her behalf have taken the asbestos supervisor training and are obviously unaware that the supervisor certification in intended to ensure that asbestos supervisors do not permit their employees to "cut corners."  This is once again an attempt by defendant Laskin to shift responsibility to supervisors like Madeline Alonge. Finally in her Sentencing Memo, defendant Laskin tries to distance herself from accountability for paying the restitution she agreed to pay in paragraphs 1(d) and G of her PA. Distilled, she states that the government and Court should ignore the MVRA and all theories of *Pinkerton* liability, because the victims of her crimes cannot definitively prove defendant Laskin's actions were the cause of any potential illnesses. However, defendant Laskin does not want this Court to approve the United States' plan to identify and properly screen those victims. This is nothing more than an attempt to undermine the restitution obligations in her PA. In short, defendant Laskin has manipulated this situation from pillar-to-post and has demonstrated that she has no respect for her colleagues, business partners, employees, inspectors, EPA-CID agents, Grand Jury, victims, and, to some extent, the Court as she has minimized her responsibility, back-tracked on her PA and acceptance of responsibility, and is attempting to shift the blame to anyone and everyone she can. The Court should not permit such manipulation to continue.

Defendant Landell's behavior was, in some respects, more obstructive, considering that his entire mode of doing business appeared to be premised on misleading NYSDOL and "not

telling them too much." *See* Landell PA ¶ 5(f). Rather than act as the party responsible for

"overseeing compliance with NYSDOL" regulations and "preventing visible emissions," Landell

took tens of thousands of dollars to assist in the acceleration of work, falsify paperwork, ignore

wait-times and visual inspection requirements, and deflect inquiries from regulatory authorities.

Put another way, Landell was paid to coordinate the systematic deception of NYSDOL

regulators. When Landell knew he had been caught and that a serious NOV would be issued on

March 1, 2016, Landell fabricated the Piker letter to shift blame away from himself. To this day,

Landell continues to quibble with the meaning of regulations and minimize his own conduct as

reflected in his recent submissions. Even more startling is that as recently as August 2019,

NYSDOL caught Landell running asbestos monitoring services without a license under a guitar

company's d/b/a. Evidently, Landell was writing NYSDOL variances and signing the music

company owner's name. *See*, *e.g.,* Pensabene Declaration (Ex. 10 hereto); Pensabene IAR at 15

(Ex. 15 hereto). Landell had no respect for the law during the TechCity project (and made tens of

thousands of dollars circumventing asbestos regulations) and, as evidenced by ongoing efforts to

work without a NYSDOL license, Landell continues to disrespect the law. His behavior also

speaks to the need to deter his future criminal conduct.

      b. **Defendants Alonge and Yakup**

These two individuals had lesser—but significant—roles in this conspiracy. While

defendants Alonge and Yakup did not direct the systematic falsification and fabrication of

documents, as did Laskin and Landell, Alonge and Yakup were certified asbestos abatement

*supervisors*, who were entrusted with the safety of both their crews and the public generally.

Alonge and Yakup underwent extensive training, part of which emphasized the importance of

following asbestos regulations, as well as the health and legal consequences for failing to do so.

For weeks-to-months, these individuals disregarded those regulations and exposed unwitting members of the public to hazardous air pollutants that have the ability to cause long-lasting health implications. If there is any doubt as to Alonge's and Yakup's callous disregard for the asbestos regulations at issue, the Court need look no further than Exhibit 11 hereto—a photograph of defendant Alonge, lying down on the floor of a work area, surrounded by dry asbestos debris, texting.

### c. Defendant Osterhoudt

Admittedly, defendant Osterhoudt had never taken part in an asbestos project before TechCity and was, at least under Contract #1, engaging in activities beyond his expertise and was under pressure from his bosses to cut costs at every opportunity. That said, Osterhoudt was made aware of the repeated NOVs being issued and was therefore aware of the asbestos regulations and that A2ES and HRVE were violating those regulations. Osterhoudt's decision to terminate Contract #1 was monetary and timeline driven – not environmental. Despite knowing the lawless manner in which A2ES and HRVE were operating, Osterhoudt nonetheless rehired A2ES and allowed both companies to continue working after learning that more-reputable abatement companies were significantly more expensive. Rather than direct A2ES and HRVE to "be careful," Osterhoudt attempted to accelerate the work of their employees. *See, e.g.*, Alonge IAR at 3. To the extent his role in this criminal enterprise was less than the other defendants, his misdemeanor plea is more than adequate to reflect that minimized role.

### 4. Deterrence

18 U.S.C. § 3553(a)(2)(B) requires the Court to consider "the need for the sentence imposed ... to afford adequate deterrence to criminal conduct." In this case, significant terms of imprisonment within the applicable guidelines ranges would continue to ensure adequate

deterrence to the defendants themselves and to others who might otherwise be disposed to commit similar crimes.

    a. **Specific Deterrence**

Regarding specific deterrence for these defendants, it bears repeating that the conspiracy to which the defendants pled guilty were not lone, isolated, or aberrant episodes of criminality. Their amalgamated actions were a lengthy criminal enterprise encompassing numerous instances of nefarious conduct. The defendants were issued more than ten NOVs, and NYSDOL and OSHA repeatedly attempted to bring these entities into compliance. The defendants refused to do so and continued their violations of NESHAP and NYSDOL asbestos regulations to the detriment of the community.

With respect to defendant Laskin specifically, OSHA cited her and took her to a full administrative hearing. Defendant Laskin simply ignored the $6,000.00 fine that remains unpaid to this day. Clearly, warnings, fines, civil infractions, etc., have failed to serve their intended purposes for this defendant in particular. Only a term of incarceration, as well as the imposition of the special conditions proposed by the parties, will deter this defendant from future criminal conduct.

With respect to defendant Landell, specifically deterring his environmental violations needs to be a priority. As mentioned above, Landell's conduct continues to be problematic. He is continuing efforts to operate in the asbestos industry through other d/b/a's and, even after being investigated for the instant offenses, has continued his attempts to mislead NYSDOL. *See, e.g.*, Exhibits 10, 11, and 15 hereto. More specifically, NYSDOL discovered that in 2018, after defendant Landell let his asbestos licenses expire, Landell "was writing variances and [RT; the owner of a music business] was signing them."  *See* Pensabene IAR at 2 (Ex. 15 hereto). Landell

believes to this day, that he is smarter than all the regulators and can profit by helping customers circumvent the environmental regulations intended to protect human health and the environment. If this Court does not impose a sentence of incarceration, defendant Landell will continue to profit by breaking environmental laws at the cost of the community's health.

b. **General Deterrence**

As for general deterrence, the government submits that its requested sentences will send a message to the community that violating laws intended to promote public health and safety will not be tolerated. Most environmental laws—including the CAA's regulation of asbestos removal and disposal—operate within a regulatory framework that depends on the regulated community following the requirements and self-reporting and following the boundaries set forth in the law. Parties defecting from that framework, like the defendants here, undermine that system and directly put other parties following the rules at a financial and competitive disadvantage (e.g., the several other abatement contracting companies that A2ES underbid for *both* Contracts 1 and 2). Allowing this conduct to go unaddressed will only embolden other asbestos abatement contractors and project monitors to "cut corners," so that they may remain competitive.

With respect to defendant Landell specifically, the United States has attempted to address systemic and structural problems within New York State's air- and project-monitoring industry for many years. Several cases in this District have signaled such an effort. *See, e.g., United States v. Desnoyers*, No. 11-CR-5194, 2009 WL 2986664, at *2 (N.D.N.Y. Sept. 14, 2009). However, thus far, the probationary sentences meted out in those cases have not deterred untoward air- and project-monitors. Rather, defendant Landell appears to have been emboldened, admittedly carrying out an even greater level of sophistication in his deceptive conduct. *See, e.g.*, Landell PA ¶ 6(a)(iv). If this Court does not send a message to the air- and project-monitoring industry,

41

this industry will continue to undermine, rather than "oversee" compliance with asbestos regulations.

<u>**CONCLUSION**</u>

For all the foregoing reasons, the United States prays for an order of this Court sentencing the defendants as set forth above.

Dated: September 22, 2021                    Respectfully submitted,


                                             TODD KIM
                                             Assistant Attorney General
                                             U.S. Department of Justice

                                    By:      /s/ Todd W. Gleason
                                             /s/ Gary N. Donner
                                             Trial Attorneys
                                             Env. & Natural Resources Div.
                                             Env. Crimes Section
                                             Bar Roll Nos. 512301, 512380
                                             P.O. Box 7611
                                             Washington D.C. 20044
                                                  Tel. No. 202-305-0739
                                             Emails: todd.gleason@usdoj.gov
                                                     gary.donner@usdoj.gov

<u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on September 22, 2021, the foregoing and all exhibits thereto were filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. Parties may access this filing through the Court's electronic filing system.

By:     <u>/s/ Todd W. Gleason</u>
            Todd W. Gleason
            Environmental Crimes Section

43